Richard J. Wagner, Esq. (RW 3017)
Brooklyn Center for Law & Justice, Inc.
c/o Jacob, Medinger & Finnegan, LLP
1270 Avenue of the Americas
New York, New York 10020
212-332-7700

**04   5620**

GARAUFIS, J.

DEC 2 2 2004

BROOKLYN OFFICE

Peter A. Cross, Esq. (PC 8492)
Hugh A. Zuber, Esq. (HZ 4935)
Jacob, Medinger & Finnegan, LLP
1270 Avenue of the Americas
New York, New York 10020
(212) 332-7700

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

LINDA COUNCIL and KIMBERLY COUNCIL,

                Plaintiffs,

      -against-

BETTER HOMES DEPOT, INC., ERIC FESSLER
individually and as President of Better Homes Depot, Inc.,
MITCH LEWIS, MADISON HOMES EQUITIES, INC.,
NADINE MALONE, individually and as President of
Madison Homes Equities, STEPHEN F. WEINSTOCK, ESQ.,
PAULA C. YEAGER, NEAL H. SULTZER, ESQ.,
ACKERMAN, RAPHAN & SULTZER, PARAGON
ABSTRACT, INC., GAIL S. ZUCKER, CLA, INC.,
CHRISTOPHER LIANO, ROBERT DOSCH, JOHN DOE,
XYZ CORPORATION, STEVE ROE, CHASE MORTGAGE
COMPANY WEST and THE UNITED STATES DEPTARTMENT
OF HOUSING AND URBAN DEVELOPMENT,
                Defendants.
-------------------------------------------------------------------X

Index No.

**COMPLAINT**

      Plaintiffs, the Reverend Linda Council and Kimberly Council, by their attorneys, Richard

J. Wagner, Esq., of Brooklyn Center for Law & Justice, Inc., and Peter A. Cross, Esq. and Hugh

Zuber, Esq. of Jacob, Medinger and Finnegan, LLP, as and for their Verified Complaint, allege

the following of their own personal knowledge, and upon information and belief as to those

matters they have grounds to believe are true.

## PRELIMINARY STATEMENT

1.  This action is brought against private defendants by two African American co-purchasers of residential real property for multiple acts of fraud, conspiracy to commit fraud, aiding and abetting the commission of fraud, professional malpractice, and violation of state statutes, to wit: the New York State Deceptive Practices Act (General Business Law § 349) and federal statutes, to wit: 15 U.S.C. §1691 (Equal Credit Opportunity Act). The action seeks money damages, rescission and/or reformation of contracts related to the financing of plaintiffs' property, declaratory relief, as well as costs and attorney fees for plaintiffs' counsel.

2.  The action also seeks a declaratory judgment (28 U.S.C. § 2201) against the United States Department of Housing and Urban Development (HUD) declaring that the agency has failed to discharge its responsibility to prevent, prohibit and eliminate race discrimination in housing related transactions pursuant certain provisions of the National Housing Act (12 U.S.C. §§ 1708, 1709) and Fair Housing Act (42 U.S.C. § 3605), enforceable under the Administrative Procedure Act (5 U.S.C. §701 et seq.) by violating the duty it owes to prospective minority home buyers to: (a) exercise reasonable care and due diligence in the issuance of Federal Housing Administration (FHA) insured mortgages so as to prevent discriminatory treatment of minority home buyers; and (b) warn prospective minority purchasers/borrowers of a known and substantial risk of fraud and of the characteristics and hallmarks of fraudulent "predatory" lending/selling schemes and practices.

## JURISDICTION

3.  Jurisdiction is conferred by 28 U.S.C. §§ 1331, 1337, 1343(3) and (4), and 1346.

4.  Supplemental jurisdiction is conferred by 28 U.S.C. § 1367.

## PARTIES

### Plaintiffs:

5.  The Reverend Linda Council and daughter Kimberly Council (hereinafter the "Councils") are the joint purchasers of residential real property located at 102 Etna Street, Brooklyn, New York.

### Defendants and the role of each in the scheme to defraud plaintiffs

6.  Better Homes Depot, Inc. (hereinafter, BHD) was, at all times pertinent hereto, a corporation organized under the laws of the State of New York with its principal place of business located at 106-10 Rockaway Boulevard, Ozone Park, New York 11416.  BHD acts as a seller of residential property, as well as a real estate broker.  As alleged in detail below, BHD, acting in concert with other defendants, engaged in a pattern and practice of fraudulently inducing first-time, minority home buyers, including the Councils, to purchase property which is often dilapidated or in substantial disrepair at grossly and fraudulently inflated prices.

7.  Eric Fessler (hereinafter "Fessler") was, at all times pertinent hereto, President of BHD and is one of the principal architects of the agreement among the defendants to participate in the conspiracy to sell homes at grossly inflated prices by engaging in a series of deceptive, dishonest and corrupt acts and practices directly and/or through others acting at his behest or on his behalf.  Fessler is a principal beneficiary of the fraudulent scheme.

8.  Mitch Lewis (hereinafter "Lewis") was, at all times pertinent hereto, a real estate agent employed by BHD, and who acts under the direction and at the behest of Eric Fessler, and who made fraudulent representations and fraudulently concealed material facts in furtherance of the conspiracy, and knowingly aided and abetted the fraudulent scheme to induce unsuspecting minority purchasers, including the Councils, to purchase and finance homes at fraudulently inflated prices, and to conceal from them serious physical defects in said homes.

9.   Steve "Roe" (hereinafter "Steve"), whose last name is presently unknown to plaintiffs, was, at all times pertinent hereto, a real estate agent employed by BHD, and who acts under the direction and at the behest of Eric Fessler, and who made fraudulent representations and fraudulently concealed material facts in furtherance of the conspiracy, and knowingly aided and abetted the fraudulent scheme to induce unsuspecting minority purchasers, including the Councils, to purchase and finance homes at fraudulently inflated prices.

10. Madison Home Equities, Inc. (hereinafter, MHE) was, at all times pertinent hereto, a corporation organized under the laws of the State of New York with its principal place of business located at 2001 Marcus Avenue, Suite South 170, Lake Success, New York 11042. MHE's role in the fraudulent scheme and the conspiracy to commit it was, *inter alia,* to finance home purchases at prices it knew to be fraudulently inflated, including the sale to the Councils, and to obtain mortgage insurance from the FHA by the submission of fraudulently inflated appraisals and overstatements of purchasers' creditworthiness. It reaped immense financial benefits by selling these insured mortgages for substantial sums to bulk purchasers such as defendant Chase Mortgage Company West.   It is currently under a five-year suspension from participation in the FHA program as the result of its improper and fraudulent practices.

11. Nadine Malone (hereinafter "Malone") was, at all times pertinent hereto, President of MHE and, at all times pertinent hereto, was involved in an undisclosed business and personal relationship with BHD President, Eric Fessler. Together with Fessler, Malone is the principal architect of the financing component of the fraudulent scheme alleged herein by, *inter alia,* confirming the fraudulent claims that the sales reflect "fair market value", by deceiving purchasers regarding the actual affordability of the property, by soliciting and submitting to the FHA intentionally inflated appraisals and exaggerated statements of the income and assets of purchasers, including the Councils, without their knowledge, and by misleading

4

purchasers/borrowers into believing that the FHA had approved and vouched for the legitimacy of all elements of the transaction.

12. "John Doe" (hereinafter "Doe ") was, at all times pertinent hereto, an employee of MHE and, in furtherance of the conspiracy, and in knowingly aiding and abetting commission of the fraudulent scheme, falsified plaintiffs' loan application in connection with the financing of 102 Etna Street, Brooklyn, New York, without their knowledge or consent, and engaged in other deceptive and corrupt acts, including assuring plaintiffs of the affordability of the premises.

13. Paula C. Yeager was, at all times pertinent hereto, an employee of MHE, and acted at the behest and under the direction of Nadine Malone in falsely and fraudulently certifying to HUD that the application for mortgage insurance was in all respects in compliance with HUD and/or FHA rules and regulations, knowing this to be untrue, and did same for the purpose of advancing and furthering the fraudulent scheme.

14. Neal H. Sultzer (hereinafter "Sultzer") was, at all times pertinent hereto, an attorney with the law firm of Ackerman, Raphan & Sultzer with offices at 2949 Long Beach Rd., Oceanside, New York 11572 and at all times pertinent hereto routinely represented *both the seller*, BHD, *and the lender*, MHE, in the sales and financing of homes, including the sale and the financing of the plaintiffs' home, as part of the fraudulent scheme, knowing the same to be fraudulent, and doing so in furtherance of and in knowingly aiding and abetting the conspiracy to commit fraud.

15. Ackerman, Raphan, & Sultzer with offices at 2949 Long Beach Rd., Oceanside, New York 11572 was, at all times pertinent hereto, the law firm which routinely represented both BHD and MHE in the implementation of the fraudulent scheme, knowing same to be fraudulent, and authorized and directed its member, Neal Sultzer, Esq., to participate in the conspiracy to

commit fraud and to further, advance and knowingly aid and abet said conspiracy through its representation of BHD and MHE.

16. CLA, Inc., (hereinafter "CLA") with offices at 270 Spagnoli Road, Suite 108, Melville, New York was, at all times pertinent hereto, a knowing participant in the conspiracy and knowingly aided and abetted the conspiracy to sell homes, financed by federally insured mortgages, which furthered both the fraudulent sale and financing components of the transactions, including the sale to plaintiffs, by knowingly preparing and supplying a fraudulently inflated real estate appraisals including that prepared for plaintiffs home.

17. Christopher Liano (hereinafter "Liano") was, at all times pertinent hereto, the principal owner of CLA and routinely made his company and its employees available to MHE and Malone for the express purpose of fabricating grossly inflated appraisals which substantiated the inflated contract prices set by BHD, and were instrumental in the acquisition of FHA mortgage insurance. Upon information and belief, Liano was indicted or otherwise charged with the commission of a felony in connection with the preparation of appraisals of residential property.

18. Robert Dosch was, at all times pertinent hereto, a licensed, HUD-certified real estate appraiser employed by CLA and Liano, and who routinely prepared the inflated appraisals on residential properties being sold by BHD, including the sale to Plaintiffs, and did so in furtherance of the conspiracy and knowingly aided and abetted the conspiracy including the knowing deception of the FHA in order to obtain the mortgage insurance essential to completion of the fraudulent scheme.

19. Stephen F. Weinstock, Esq. (hereinafter "Weinstock") was, at all times pertinent hereto, an attorney admitted to practice law in the State of New York with offices at 80 Cuttermill Road, Suite 408, Great Neck, New York. He was one of a small group of attorneys

routinely utilized by BHD and other defendants, including plaintiffs, who purported to provide

legal counsel to prospective home buyers, including plaintiffs, when in fact his role was to

deceive plaintiffs and other victims into believing that their legal rights and interests were being

protected when, in fact, his role was to aid and abet the fraud directed against his clients, prevent

them from obtaining independent legal advice and counsel, and to lull and deceive them,

including plaintiffs, into believing that the instant transaction was legitimate and beneficial.

20. Gail S. Zucker (hereinafter "Zucker") was, at all times pertinent hereto, an employee

of Paragon Abstract, Inc., who routinely acted as the "title closer" at the closings of BHD sales

where MHE was the mortgagee, including the closing of title between BHD and Plaintiffs.  Upon

information and belief, Zucker is a sister or other relative of Eric Fessler and her role was to

cover up defects in title and/or other irregularities or obstacles to the conveyance of title, and

who did so knowingly, in furtherance of and to aid and abet the implementation of the fraudulent

scheme.

21. Paragon Abstract, Inc. (hereinafter "Paragon") was, at all times pertinent hereto, a

title company located at 366 North Broadway, Jericho, NY 11753 and the employer of Gail S.

Zucker, which knowingly permitted and assigned her to act as title closer at virtually all sales of

homes by BHD to minority first time home buyers, including plaintiffs, and did so intentionally

to further and aid and abet the implementation of the fraudulent scheme.

22. XYZ Corporation was, at all times pertinent hereto, a corporation duly qualified to

issue title insurance in the State of New York

23. Chase Mortgage Company West (hereinafter referred to as "Chase") was, at all times

pertinent hereto, a corporation organized and existing under and by virtue of the laws of the State

of New Jersey, and is duly qualified to conduct business in the State of New York, having its

principal office at 3415 Vision Drive, Columbus, Ohio and is an alleged assignee of MHE.

24. United States Department of Housing and Urban Development (hereinafter, "HUD") was, at all times pertinent hereto, the federal agency under the auspices of which the Federal Housing Administration (hereinafter, "FHA"), is responsible for issuing mortgage insurance policies, paid for by purchasers/borrowers but which insure lenders against a future default by said borrowers. HUD, through the FHA, has engaged in a pattern of "rubber stamping" applications for FHA mortgage insurance and of issuing such insurance to known or suspected predatory lenders, without reasonable care or due diligence to prevent schemes to defraud minority home buyers, and further, has further failed to adequately warn prospective minority purchasers/borrowers of both the appreciable risks and known hallmarks of a predatory loan.

## STATUTORY AND REGULATORY FRAMEWORK

25. This action arises, *inter alia*, under *the Federal Fair Housing Act (42 U.S.C. §§ 3601 et seq.)*, the National Housing Act (12 U.S.C. § 1701 et. seq.); the Truth-in-Lending Act (15 U.S.C. § 1601); the Equal Credit Opportunity Act (15 U.S.C. § 1691); the Administrative Procedure Act (5 U.S.C §§ 701-706); and the Deceptive Practices Act (GBL § 349).

26. The Federal Fair Housing Act seeks, among other things, to prohibit discrimination in the rental and sale of housing, and imposes upon the HUD Secretary the duty to administer HUD programs and activities in a manner affirmatively designed to carry out the policy of prohibiting discrimination.

27. The National Housing Act provides for the FHA to extend mortgage insurance to lenders, permitting them to provide mortgage loans to persons who are unable to make the large, lump sum down payments necessary to qualify for "prime" mortgages.

28. The Truth-in-Lending Act provides monetary and, where appropriate, other relief, including attorneys' fees, for failure to accurately disclose a variety of financial information.

29. The Equal Credit Opportunity Act makes it unlawful for any lender to discriminate against any applicant for credit in any aspect of a credit transaction on the basis of race and provides monetary relief and attorneys' fees for its violation.

30. The Administrative Procedure Act provides a private right of action for any person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action.

31. The New York State Deceptive Practices Act prohibits deceptive practices in the conduct of any business, trade or commerce or in the provision of any service, and provides for money damages, injunctive relief and attorneys' fees for its violation.

## STATEMENT OF FACTS

32. BHD and MHE, at all times pertinent hereto, and their respective principals, Eric Fessler and Nadine Malone, were the central characters in a widespread conspiracy to commit fraud, in which the co-conspirators have entered into an agreement whereby they would target uninformed, inexperienced, minorities embarking on the first-time purchase of a home and, by a variety of means specifically described below, including but not limited to fraudulent misrepresentations of material fact and fraudulent concealment of material facts, would fraudulently induce them to buy property from BHD at grossly inflated prices, financed by FHA-insured mortgages supplied by MHE.

33. Plaintiffs are low-to-moderate income African American first time home buyers who, a the time of the purchase of their home, were entirely inexperienced in the processes and practices involved in the purchase of residential real estate.

34. In or about August of 1998 Reverend Linda Council saw a BHD advertisement in the newspaper boasting affordable homes for "first time buyers" with "low" to "no" down payment or closing costs.

35. During that same week, Kimberly Council, while walking in the Bedford-Stuyvesant section of Brooklyn, came across a BHD brownstone for sale. She told her mother about the brownstone and then had her mother call BHD to set up an appointment to see that particular house as well as any other listings within their price range.

36. After placing the telephone call, the Councils were told by a BHD representative that they should come down to their Queens office. They were also instructed to bring with them several financial documents including copies of their W-2's, recent pay stubs and tax forms.

37. Upon arrival at BHD the Councils were introduced to defendant Mitch Lewis, a BHD real estate agent. Lewis gathered all of their financial information and documentation and then had the Councils watch a video presentation about BHD. The video highlighted "before" and "after" pictures of BHD renovated homes and several interviews of happy BHD customers who felt that BHD "changed their lives." Throughout the initial consultation, Lewis claimed that BHD would help them get a home of their dreams at a "bargain price."

38. Reverend Linda Council expressed to Lewis her overall worries and concerns which mainly stemmed from her inexperience in the area of real estate. Lewis falsely and fraudulently, with the intent to deceive and defraud, told her that he would help her along the way. Additionally, Lewis told the Councils that they would have to undergo an interview process to determine what house was best suited and most affordable for them.

39. Upon information and belief, the "real" or dual purpose of the interview was to establish a "profile" that would assure BHD that the plaintiffs were sufficiently inexperienced in the purchasing and financing of residential real estate so that they would constitute a vulnerable target for a fraudulent buying/lending scheme, and to acquire sufficient financial information about them from which BHD could extrapolate the maximum amount it could plausibly set as a sale price for any house it would be able to sell them.

40. After receiving and reviewing the Councils' financial documentation and the showing of the BHD video, defendant Lewis introduced them to a man named "Steve" who falsely and fraudulently, with intent to deceive, claimed to be the President of BHD.

41. "Steve" spent a considerable amount of time telling the Councils about BHD's interest and desire to help low income minorities achieve the "American Dream" of home ownership. "Steve" also falsely and fraudulently, with intent to deceive told the Councils that it was his duty to find them a good home at a "bargain price" which they could afford.

42. Upon information and belief, "Steve's" true intention was to obtain the trust of the Councils under false pretenses by claiming that it was his personal quest to enable people of color to obtain the "American Dream" of home ownership. This race-based sales pitch is a part of the planned and calculated method of operation engaged in by the broker or agent members of the fraudulent scheme and is consciously intended to disarm prospective minority home buyers of any natural skepticism they may have had from the outset.

43. The Councils were then taken to several homes in poor and impoverished neighborhoods in Brooklyn. All of the homes shown to them were in serious need of repair and were not what they wanted. One home that the Councils did like, the "model" home, was not on the market for sale and according to Lewis was "outside of your price range."

44. The "model" house was/is used to lure potential victims of BHD into the fraudulent scheme by showing them what a completed house would look like after being repaired and refurbished.

45. Soon thereafter, "Steve", acting under the direction and at the behest of Eric Fessler and in furtherance of and to aid and abet that portion of the fraudulent scheme steered the Councils to an MHE representative, "John Doe" (hereinafter "Doe" ), to discuss the financing of a loan.

46. At the initial meeting between MHE, BHD and the Councils, plaintiff Linda Council expressed her concern about her ability to obtain a mortgage due to her credit score and monthly income. Moreover, she was more concerned about receiving a mortgage that would be overwhelming and unmanageable. However, both "Steve" and Mitch Lewis from BHD reassured her and stated that by buying a two-family house, they had the option of "living for free" by renting out the other available unit. "Steve" also mentioned that BHD would put them in touch with potential renters and they need not worry.

47. After gathering all of the necessary financial information including but not limited to plaintiffs W-2's, recent pay stubs and outstanding bills, "Doe" told them to sign a blank loan application that he would fill out later. "Doe" assured the Councils that signing the blank loan application was standard operating procedure and was done as a convenience to save them from having to wait in his office while he completed the forms. In fact, his true purpose was to fraudulently alter the information that the plaintiffs' had provided, exaggerating their income and the value of their assets to make them appear more creditworthy to the FHA.

48. The falsified loan application completed by the Doe, in consultation with defendant Malone, not only disregarded the Councils' inability to afford a mortgage in excess of $200,000, but also contained overstated amounts for their assets and income which were added after plaintiffs had executed the form, and without their knowledge and consent.

49. In or about November of 1998, the Councils were shown another property located at 183 Etna Street in Brooklyn, New York. According to Lewis the sales price for this home was $230,000 dollars. The plaintiffs expressed their concern about their ability to qualify for such a mortgage and their ability to make and sustain the monthly mortgage payment.

50. Plaintiffs also informed Lewis that they had to vacate their current home by the end of January, 1999.

51. Once again, Steve told them not to worry and that they would not have a problem qualifying for a loan and that with the rental income that they would receive, they would manage without any problems. As such, based upon the false and fraudulent assurances made by "Steve", the Councils, without legal representation, signed a contract of sale for the property located at 183 Etna Street in Brooklyn, New York.

52. In or about the first week of January 1999, the Councils received a telephone call from "Steve" of BHD. "Steve" falsely and fraudulently, with intent to deceive told them that due to some title problems, the property they were contractually obligated to purchase, was not available. "Steve" was aware that the Councils were obligated to vacate the premises they were then living in by the end of January, 1999.

53. "Steve" told plaintiffs that 183 Etna was no longer an option but there was another property, 102 Etna Street, which was just as nice and less expensive. Most importantly it was ready and available immediately.

54. The availability of the new property was of interest to the Councils as they were already committed and legally obligated to move out of their present apartment and were concerned about being homeless. Therefore, they agreed to see the property at 102 Etna Street and eventually agreed to purchase this property believing that they had no other option available.

55. What they did not realize until they conferred with their current attorneys was that the contract to sell them the original property was a sham transaction which employed a "bait and switch" tactic whereby victims are kept "on the hook" to purchase the first property against the chance that a higher bidder might be found, and if found, are then steered to another, often less desirable property for the same or slightly less money. This "bait and switch" scam was, at all times pertinent hereto, frequently employed by BHD, Fessler and numerous minority victims of BHD have found that it is a practice of BHD, even after they entered a contract of sale, to

"abort" the initial transaction on some false pretext whenever a new purchaser was identified who was willing to pay more than the prior purchaser.

56. "Steve" falsely and fraudulently, with intent to deceive the Councils emphasized that this was an affordable property and would be repaired to their specifications, which mainly included that the home would be a legal two family house in order to generate rental income.

57. At no time were the Councils informed by any of the defendants that the subject premises, 102 Etna Street, *was not* a "legal two family" dwelling containing two legal rental units. Before the BHD modifications, the building was a legal two family. However, BHD converted the second floor rental unit and then illegally placed a kitchen and bathroom in the basement. Not only did BHD never obtain valid work permits for the modifications and repairs, but also they never sought a new or amended Certificate of Occupancy for the new unit arrangement.

58. Later in that first week in January, the Councils were shown the 102 Etna Street property for the first time as it was undergoing what they believed would be extensive repairs. They were falsely and fraudulently, with the intent to deceive, told by BHD employees that all of the repairs would be complete (except the basement) by the time they moved into the home, including the installation of a new roof and boiler.

59. During that same week, plaintiffs were "steered" to attorney Stephen F. Weinstock. It was at this time that Weinstock told the Councils that he would be handling the closing for them and that he would "look out for [their] best interests" as well as "take care of everything."

60. On January 13, 1999, Robert Dosch of CLA, Inc. completed the appraisal for 102 Etna Street. This appraisal was done at the request of MHE, the lender, and was prepared with the intent to deceive the FHA into granting FHA insurance for the mortgage.

61. As part of the fraudulent application for FHA mortgage insurance by MHE, it is essential to submit to the FHA a fraudulently inflated appraisal of the property.

62. Said appraisal was intended to be independently prepared by an appraiser chosen by the FHA but is, instead, routinely prepared by an appraiser retained by the lender/applicant for mortgage insurance, who is then supposed to provide same to the purchaser. The FHA's delegation of this responsibility and authority to select the appraiser to an interested party, such as the lender, effectively aids, abets and furthers the fraudulent scheme.

63. The Councils were explicitly informed that they were not allowed to have the house appraised themselves, and that the appraisers who are "part of the program" had to prepare the appraisal, thereby once again invoking the FHA and the federal government as a means to facilitate the fraud and convey the illusion of legitimacy to the transaction by implying that HUD had approved its terms.

64. CLA, Liano, and/or Robert Dosch, with intent to deceive the FHA directly and the Councils by extension, prepared a fraudulently inflated appraisal of the subject premises at the request of MHE in order to substantiate and legitimize the latter's request for FHA mortgage insurance.

65. Moreover, the appraisal fraudulently conceals the material fact that the property had been purchased by defendant BHD less than 6 months prior to the sale to the Councils for only one hundred and thirty-one thousand dollars, ($131,000).

66. The appraisal also fraudulently conceals the material fact that the current use of the property, with a basement as a "family unit", was not a lawful use, and had the effect of vitiating the certificate of occupancy.

67. The appraisal fraudulently and falsely represents that the subject premises does not suffer from physical, functional, or external obsolescence that have an adverse affect on the

marketability and that no major repairs or remodeling were needed at the time. The appraisal did not indicate the substantial repairs that *were* needed to the property including: substantial repairs and upgrading of the plumbing system, the electrical system, replacement of a severely damaged roof, replacement of a defective boiler and extensive remodeling and refurbishing of the unfinished basement.

68. Defendants Liano, Dosch, and CLA, Inc., as participants in the illegal agreement and conspiracy to defraud, and in knowingly aiding and abetting the conspiracy, intentionally and purposefully omitted all of the above-alleged material facts as part of their role in the conspiracy and to further and advance the consummation of the fraudulent scheme, including the deception of the FHA and, by extension, the plaintiffs, Kimberly and Linda Council.

69. After BHD and MHE received the appraisal, the closing was arranged to take place at the BHD office in Queens on January 18, 1999. Steve assured the Councils that their lawyer, Mr. Weinstock would be there to represent their interests. Weinstock also assured them that he was fully familiar with all relevant documents and knew that they were all in order, and that all the Councils needed to do was to sign and/or initial various documents which Weinstock had already purportedly reviewed.

70. In furtherance of the conspiracy to effectuate the fraudulent scheme, defendant BHD had arranged for the Councils to be represented at the closing by defendant Weinstock, for the fraudulent purpose of deceiving them into believing that their legal interests and rights were being guarded and protected. The Councils relied entirely and exclusively on Mr. Weinstock to perform this function.

71. Defendant Steve Weinstock did not loyally and in good faith represent the Councils' interest in connection with the purchase and loan financing of the home, either prior to, during or subsequent to the closing on January 18, 1999.

72. At all times prior to the closing Mr. Weinstock fraudulently concealed and failed to disclose the nature and extent of his relationship with BHE and MHE and their principals, which relationship created a conflict of interest and prevented Weinstock from properly discharging his duties to the Councils. At all times prior to the closing Weinstock fraudulently concealed from the Councils their right to see any appraisal of the property, or engineering, inspection or other report that had been prepared in connection with the transaction. He never advised them with respect to the terms of the contract of sale or the mortgage terms, nor did he advise them to have an independent inspection of the property prior to closing and never advised them that it was common practice for purchasers to have residential property independently inspected by an engineer or contractor prior to closing

73. At all times prior to the closing, attorney Weinstock avoided any discussion with the Councils regarding the condition of the property, and failed to inquire whether any representations had been made to them with respect to needed and verbally agreed to repairs, or to draft a rider to the contract incorporating the promises made by defendant BHD to the Councils, all of which failures to discharge his normal duties and responsibilities were in furtherance of the conspiracy to execute the fraudulent scheme and knowingly to aid and abet the conspiracy.

74. Indeed, as part of defendant Weinstock's role of advancing and furthering the conspiracy and aiding and abetting its commission as alleged above, the only "duty" he discharged in an effective manner was his "duty" to BHD and MHE to dupe the Councils into proceeding with the subject purchase and loan with no questions asked.

75. On the day of the closing, January 18, 1999, the Councils told Weinstock that several agreed upon repairs were still incomplete. Weinstock assured them that he would make sure this was taken care of and that BHD would honor its agreement. Nevertheless, Weinstock did not

obtain any written agreement from BHD to complete the repairs and he did not require BHD to escrow any funds to protect the Councils in the event BHD failed to honor their obligations.

76. The Councils' purchase of 102 Etna Street was financed through a mortgage loan in the amount of $203,477.00, originated by defendant MHE, and said loan closed simultaneously with title. The mortgage originated by MHE was insured by the FHA.

77. It was the purpose of MHE to deceive the defendant HUD, and particularly, the FHA, into believing that the purchasers possessed a greater income available to pay the mortgage than actually existed, in order to obtain the mortgage insurance from the FHA, as well as deceiving the FHA as to the fair market value of the property.

78. Obtaining federal mortgage insurance is an indispensable part of such a fraudulent selling/lending scheme, in that the lender knows that the true value of the property is grossly insufficient to secure the actual loan amount, and therefore the mortgage lien does not actually protect the lender in case of default.

79. Further, as part of the scheme to deceive the purchasers, including the Councils, into believing that the sale price reflects the fair market, "HUD-certified appraisal" value of the property, MHE and BHD routinely invoke the fact that, by issuing mortgage insurance covering virtually the full sale price of the premises, the FHA purportedly confirmed that the sale price is equal to the fair market value.

80. In this way, the FHA's "rubber stamp" insurance approval process is utilized to advance the fraudulent scheme not only by issuance of the policy itself, which makes the mortgage itself marketable, but also by appearing to vouch for or corroborate the credibility of the underlying transaction, and particularly the sale price. MHE, BHD and their officers, employees and lawyers, with intent to deceive and defraud the purchasers, including Mr. Plaintiffs then refer to or otherwise invoke the FHA's mortgage insurance approval as proof of

the legitimacy of the entire transaction. FHA is aware of this practice and has done nothing to stop it.

81. MHE also fraudulently concealed its business relationship with the seller, BHD, including concealment of the fact that MHE had financed BHD's recent purchase of 102 Etna Street for only $131,000 dollars.

82. In reliance on false and fraudulent information provided to it by the defendant MHE in the loan application package, and the false and fraudulent statements of MHE employee Paula C. Yeager assuring the FHA that its rules and regulations had been observed, the FHA issued the requested mortgage insurance policy, naming MHE the insured.

83. At all times pertinent hereto, Paula C. Yeager was employed by MHE as its "compliance officer" and, in this capacity, Yeager routinely executed the documents which assured the FHA that applicant was in full compliance with all relevant rules and regulations despite her knowledge that MHE was, in fact, in substantial violation of a variety of such rules and regulations, including but not limited to the regulations prohibiting MHE's undisclosed business relationship with BHD.

84. The Councils loan was approved despite the fact that in the summer of 1997, HUD had sanctioned defendants MHE and Nadine Malone, President of MHE, for abuse of the FHA loan program by allowing false documents to be submitted which enabled home buyers to borrow beyond their means. The effect of this fraud is that the home purchasers borrow money in excess of their ability to repay, resulting in a substantially higher than normal rate of default on their mortgages and the loss of their homes and their equity.

85. At the closing, Defendant Neil Sultzer, Esq., of the law firm of defendant Ackerman Raphan & Sultzer represented both defendants BHD and MHE and was aware of all the fraudulent misrepresentations, fraudulent concealment of material facts, and the disloyalty of the

Councils' lawyer, Steve Weinstock, and nevertheless continued his representation of both BHD and MHE, as part of his role in the overall conspiracy and in furtherance of the consummation of the fraudulent scheme, which he knowingly aided and abetted.

86. At the closing, Sultzer was an active participant in preparation and distribution of closing documents that contained material misrepresentations of fact, including the false claim that the property was a *"legal two-family"* dwelling (including the basement), and also heard his clients repeat numerous unwritten promises regarding repairs which he knew to be false and legally without force and effect, and he effectively confirmed and legitimized these false statements and promises by his silence.

87. Present at the closing in the role of title closer was Gail S. Zucker of Paragon Abstract. Upon information and belief, Zucker is a sister or other family member of Fessler's and, at all times pertinent hereto, routinely played an integral part in concealing from purchasers, including the Councils, any defects in title or other obstacles which an honest title closer would bring to the attention of the parties, including irregularities which would ordinarily delay or prevent the transfer of title.

88. Zucker was assigned by Paragon to act as title closer in scores of closings involving MHE-financed sales by BHD to minority purchasers, and played a critical role in creating the illusion of propriety and normality, and in concealing material facts and defects from purchasers who were unaware of her relationship to Fessler.

89. As the result of her relationship with Fessler, and her participation in numerous transactions involving essentially the identical cast of characters, except for the purchaser, Zucker had intimate and detailed knowledge of the fraudulent scheme, and was a willing participant in the conspiracy to commit fraud, and knowingly aided and abetted the commission of the fraudulent scheme.

90. In furtherance of the fraudulent scheme, Weinstock withheld copies of the title and loan documents at the closing for the Councils including a "HUD statement" which, as part of standard operating procedure, would have been provided by attorney Weinstock following the closing. Thereafter, Weinstock never again had any contact with the Councils.

91. The Councils moved into the home almost immediately following the closing. The needed and promised repairs were not performed, although Linda Council repeatedly brought the problems to the attention of defendants BHD, Steve, Fessler and his agents and employees.

92. Simultaneously with the closing, the note and mortgage originated with MHE was assigned to defendant Chase Mortgage Company West.

93. The overwhelming majority of predatory and inflated sales of residential property by BHD are made to first-time minority homebuyers who they have targeted as preferred victims who lack the prior experience or frame of reference to identify a predatory sale.

94. Reverend Linda and Kimberly Council meet the profile of victims of predatory lending, as determined by HUD, and the subject premises is located in the geographical heart of an area which HUD has designated as the nation's number one "hot zone" of the practice known as predatory lending.

95. The circumstances encountered by the plaintiffs in this transaction, include but are not limited to (a) the steering of a purchaser/borrower to a particular lender by a real estate broker or seller; (b) the steering of the purchase/borrower to a particular lawyer recommended or provided by the seller or real estate broker; (c) the use of "bait and switch" sales techniques; (d) the discouraging of the purchaser/borrower from obtaining independent inspection and/or engineering reports; (e) discouraging purchaser/borrower from obtaining an independent appraisal; (f) use of an inflated appraisal of property; (g) accelerated time from contract of sale to

closing and (h) evidence of a recent prior purchase at a substantially lower price; are all hallmarks of predatory lending which are well known to HUD and its subdivision, the FHA.

96. Despite HUD's actual knowledge of the locations, indicia and victim profiles of the predatory lending epidemic, neither HUD or the FHA provide any warning to purchasers setting forth either the risks or the signs of a predatory sale or loan.

97. The process by which HUD, through the FHA, evaluates applications for mortgage insurance completely disdains any precautionary action or heightened degree of diligence regarding applications which, on their face, involve one of HUD's own designated predatory lending hot zones, despite its actual knowledge that obtaining federal mortgage insurance is an essential element of the fraudulent predatory lending scheme which targets racial minorities.

98. Every contract of sale of residential real property involving a mortgage insured by the FHA contains, or is supposed to contain, an "FHA RIDER" requiring the seller, prior to completion of the purchase, to provide the purchaser with a statement issued by the Federal Housing Commission setting forth the appraised value at being not less than the amount of the mortgage being insured by the FHA.

99. HUD engaged in a pattern of failing to issue such statement, and/or failing to insure this Rider is made part of the contract of sale, and/or failing to insure that, if such FHA statement of appraised value is issued, it was transmitted by the seller to the purchaser prior to completion of the transaction.

100.    HUD often grants lender applications for mortgage insurance policies, which are paid for by the home buyer, on the same day that the lender applies for it, or shortly thereafter, without making any inquiry or engaging in any activity typically made or engaged in by private mortgage insurers as a basic part of the latter's exercise of due diligence.

101.    Upon information and belief, HUD is aware of numerous effective precautions which would substantially protect against issuance of FHA mortgage insurance to predatory or fraudulent lenders who target racial minorities and has knowingly failed to institute any of said precautions or other meaningful measures to protect against these racially discriminatory predatory and fraudulent practices.

102.    The availability of FHA mortgage insurance to the predatory, fraudulent lender is indispensable to said lender's ability to carry out the fraudulent flip selling/lending scheme such as that alleged in this complaint.

103.    The express words of this provision are silent on the existence of a reciprocal right of the Borrower to recover costs, disbursements and reasonable attorneys' fees for a successful defense against a foreclosure action and/or for successfully pursuing a right of the Borrower under the mortgage agreement.

104.    Upon information and belief, the highest foreclosure rates in the City of New York for buildings of 2-4 units are in the minority communities of Bedford-Stuyvesant, Brownsville, East New York and Bushwick, where "flip selling" and "predatory" lending are rampant.

105.    Upon information and belief, approximately 75% of the foreclosure actions involving properties in these minority neighborhoods result in judgments by default, principally because Borrowers cannot afford to retain legal counsel without any prospect of restitution of their legal fees even if and when successful in defending against foreclosure.

106.    Upon information and belief, of the Borrowers who do not default, more than half appear and defend *pro se,* and 90% of *pro se* defendants in foreclosure actions are unable to fend off form motions for summary judgment filed by attorneys for the Lenders.

107.    A substantial portion of the minority families who lose their homes, their equity, their credit and their life savings as the result of mortgage foreclosure were the victims of predatory and fraudulent flip sales and loans, and would have had the ability to assert meritorious equitable and statutory defenses to foreclosure had they been represented by counsel.

108.    The Councils hereby allege that the above quoted language of ¶18 of their mortgage agreement contains within it an implied covenant of reciprocity regarding the availability of attorneys fees, and that if they are successful in either the defense of the underlying foreclosure action or in any of the causes of action herein that arise from the mortgage agreement, they are entitled under that paragraph to the recovery of their costs, disbursements and reasonable attorneys' fees.

109.    The Councils further allege that ¶18 of the mortgage agreement, to be given legal force and effect, must be interpreted and construed to provide for reciprocity in the right to recover costs, disbursements and attorneys' fees if successful in litigation arising out of the mortgage agreement in order to avoid said provision from being deemed unconscionable.

110.    The Councils further allege that ¶18 of the mortgage agreement must be construed as providing reciprocal rights to recover costs, disbursements and attorneys' fees in that to construe this provision to provide only a unilateral right to the Lender would violate the strong judicial and public policy that favors adjudications on the merits and disfavors adjudications by default.

111.    The Councils further allege that virtually every "boiler plate" mortgage agreement made in the State of New York contains a non-negotiable provision that provides for recovery of costs, disbursements and reasonable attorneys fees for the Lender, while remaining silent on the availability of same to the Borrower, and that these agreements are offered on a "take it or leave it" basis that offers no meaningful choice to the Borrower or opportunity to go elsewhere to

obtain a reciprocal provision. Thus, in order to avoid being deemed a contract of adhesion, this provision must be construed as being reciprocal.

## FIRST CAUSE OF ACTION: FRAUD

112. Plaintiffs repeat and reallege in this paragraph all of the allegations set forth above.

113. The defendants BHD, Eric Fessler, Mitch Lewis, "Steve Roe", MHE, Nadine Malone, "John Doe", Stephen Weinstock, Esq., Neil Sultzer, Esq., Robert Dosch, Gail S. Zucker and Paula C. Yeager each made knowingly false statements and misrepresentations of material fact to the Councils or to another person on whose actions and/or beliefs they knew the Councils would rely, with the intent to defraud them, and/or knowingly concealed from them or others on whose actions or beliefs they knew plaintiffs would rely material facts, with the intent to defraud him as specifically alleged above.

114. By virtue of the above, plaintiffs have sustained actual damages of not less than $150,000.00 to their equity, plus $70,000 for excess interest on the inflated loan, and damage to their credit in an amount not yet known or presently ascertainable.

115. As the result of being victimized by the fraudulent scheme alleged above, and particularly as the result of being targeted for such victimization as the result of their race, the Councils have suffered severe emotional pain and distress, humiliation and degradation and are entitled to compensatory damages in an amount to be determined by the trier of fact.

116. The wanton, willfully fraudulent, and racist conduct of these individual defendants, was not only morally evil, outrageous, and reprehensible, but also constituted part of a broad pattern and practice of fraudulent conduct directed at a significant and particularly vulnerable segment of the public; to wit, first time minority home buyers. By reason of this conduct, the Councils are entitled to punitive damages in the amount of $5,000,000 dollars.

25

## SECOND CAUSE OF ACTION: CONSPIRACY TO COMMIT FRAUD

### The General Pattern of the Fraudulent Conspiracy

117.    Plaintiffs repeat and reallege in this paragraph all of the allegations set forth above.

118.    Defendants Fessler and Malone of BHD and MHE respectively, conspiring, colluding and acting in concert with sellers, real estate brokers, lawyers, appraisers, and others, as alleged in ¶ 32 above, regularly engage in a widespread pattern of fraudulent business activity known as "predatory" flip selling and lending. "Predatory" selling and lending may take various fraudulent forms, including but not limited to the sale of residential real estate to unsuspecting purchasers at a grossly inflated amount by using deceptive and dishonest means and practices carried out by sellers, lenders, brokers, inspectors, appraisers, lawyers and others.

119.    This fraudulent selling/ lending scheme typically requires the seller and/or lender, as part of the overall conspiracy to defraud the purchasers, to steer the purchasers to an attorney who is, in fact, acting in furtherance of the conspiracy, and said attorney acts as the purchasers' lawyer.

120.    Because the fraudulent sellers and lenders know that the actual fair market value of the property is far below the sale price and principal amount of the mortgage, the success of the conspiracy to defraud purchaser/borrowers is dependent upon the acquisition of FHA or other mortgage insurance so that the predatory lenders, or any of its assignees, will be protected in the event the mortgagors' default.

121.    An essential element in carrying out the fraudulent, predatory selling and lending scheme is the acquisition by the lender of a fraudulently inflated appraisal which routinely and fraudulently misstates and/or conceals physical and other conditions, such as the legal occupancy status, which appraisal becomes part of the application to HUD for FHA mortgage insurance.

26

122.    A typical part of the scheme where the property sold is in need of repair work entails both false statements as to the existing conditions of the property when sold, false promises of repair and concealment of defects. The intent of these false statements, false promises, and concealment of defects is not only to fraudulently induce the victim to purchase the premises at the inflated amount, but to fraudulently induce HUD to insure the mortgage.

**The conspiracy to defraud plaintiffs:**

123.    Plaintiffs repeat and reallege in this paragraph the all of the allegations set forth above.

124.    Eric Fessler and Nadine Malone, and their respective companies, BHD and MHE participated as effective partners, and as co-conspirators with the other private defendants, have engaged in hundreds of fraudulent transactions of the same nature as that which involved the Councils purchase of 102 Etna Street, Brooklyn, New York, and included deceptive and dishonest acts and practices including but not limited to: a) manipulating plaintiffs into retaining Stephen Weinstock as their attorney; b) fraudulently concealing from them and misstating to them the actual fair market value of the subject property; c) fraudulently concealing from them and misstating to them the legal occupancy status of the premises; d) misstating to HUD plaintiffs financial status and creditworthiness in order to obtain FHA mortgage insurance; e) deceiving them with regard to the affordability of the premises at the stated sale price; f) concealing from plaintiffs physical defects at the premises; g) making false promises of repair; and h) fraudulently concealing from plaintiffs the close business and personal relationship between Fessler and Malone and their respective companies.

125.    All of the misrepresentations and concealment of material facts engaged in jointly and/or individually by the defendants were intended to deceive and defraud plaintiffs, and/or

prevent him from discovering the fraudulent scheme, and plaintiffs relied on these misrepresentations and acts of concealment to their detriment.

126. But for the fraudulent misrepresentations and acts of concealment of the private defendants by which the co-conspirators victimized plaintiffs, they would not have proceeded with the purchase of the subject premises or entered into the financing agreements incident thereto.

127. As a result of the aforesaid conspiracy to commit fraud, the mortgage loan transaction should be declared void, and the security interest created under the transaction should be terminated.

128. By virtue of the instant conspiracy to commit fraud, plaintiffs have sustained actual damages of at least $150,000.00, plus $70,000 for excess interest on the inflated loan, and damage to their credit in an amount not yet known or ascertainable.

129. Plaintiffs are entitled to compensatory damages as alleged in ¶ 114 above.

130. Plaintiffs are entitled to punitive damages as alleged in ¶ 116 above.

### THIRD CAUSE OF ACTION: AIDING & ABETTING

131. Plaintiffs repeat and reallege all of the allegations set forth above as though fully set forth herein.

132. The private defendants have aided and abetted the fraudulent scheme, the conspiracy to commit fraud, and the violation of the Equal Credit Opportunity Act, the Fair Housing Act and Deceptive Practice Act by virtue of the acts and statements alleged against them in this complaint, and the Councils are entitled to such damages as are provided by statute as to the statutory claims, and as sought in ¶¶ 114, 115 and 116 above on the fraud and conspiracy to commit fraud.

## FOURTH CAUSE OF ACTION: EQUAL CREDIT OPPORTUNITY ACT

133.    Plaintiffs repeat and reallege all of the allegations set forth above as though fully set forth herein.

134.    MHE, as the predecessor in interest to plaintiff in this action, is the creditor of plaintiffs for purposes of the Equal Credit Opportunity Act (15 U.S.C. § 1691(a)). It is unlawful and a violation of said federal statute for any creditor to discriminate against any applicant for credit, *with respect to any aspect of a credit transaction*, on the basis, *inter alia,* of race, color, or national origin.

135.    MHE and Malone, in conspiracy with and aided and abetted by the other co-conspirators, engaged in such discrimination against Plaintiffs as part of a broader pattern of such discriminatory lending practices which target minority first time home buyers for unfair, dishonest and deceptive acts and practices as those alleged above.

136.    Pursuant to 15 U.S.C. §1691 (e)(c), the plaintiffs are entitled to rescission of the mortgage, and, pursuant to 15 U.S.C. §1691 (e)(d), the plaintiffs are entitled to recover the costs and attorneys fees of its private counsel in this action.

## FIFTH CAUSE OF ACTION: FAIR HOUSING ACT

137.    Plaintiffs repeat and reallege all of the allegations set forth above as though fully set forth herein.

138.    BHD and MHE are engaged in residential real estate transactions for purposes of the Fair Housing Act [42 U.S.C. §3605(b)]. It is unlawful and a violation of said federal statute for any entity engaged in residential real estate transaction to discriminate against any person in making available such a transaction, on the basis, *inter alia,* of race, color, or national origin.

139.    As described, MHE and BHD, directly, in conspiracy with and aided and abetted by the other private third party defendants, engaged in such discrimination against the Councils

as part of a broader pattern of such discrimination, by targeting first time minority homes buyers engaging in selling and lending practices directed at them which were unfair, deceptive, dishonest and fraudulent and predatory.

140.   By reason of such racial targeting of plaintiffs, they were induced to enter into a mortgage the costs of which, over the life of the mortgage, would exceed by hundreds of thousands of dollars the cost of financing a truly fair market purchase.

141.   Pursuant to 42 U.S.C. §3605 plaintiffs are entitled to rescission of the mortgage.

## SIXTH CAUSE OF ACTION: DECEPTIVE PRACTICES ACT

142.   Plaintiffs repeat and reallege all of the allegations set forth above as though fully set forth in this paragraph.

143.   New York State's General Business Law §349 (The Deceptive Practices Act) prohibits deceptive acts and practices in the conduct of any business, trade or commerce or in the furnishing of any service.

144.   Each of the non-governmental defendants has committed one or more such acts and/or engaged in one or more such practices as set forth in this complaint. Thus, the specification of fraudulent acts or concealment of material fact set forth and described above also constitutes a violation of the Deceptive Practices Act.

145.   As a result of the above conduct constituting deceptive practices, private defendants are jointly and severally liable for and plaintiffs are entitled to an award of $150,000.00 and $70,000 for excess interest on the inflated loan for their actual damages, and are entitled to costs, disbursements and attorneys' fees.

## SEVENTH CAUSE OF ACTION: MALPRACTICE

146.   Plaintiffs repeat and reallege the allegations set forth above as if fully set forth in this paragraph.

147.     The conduct of defendant Stephen Weinstock, Esq., in providing legal counsel to the Councils, as described above, utterly failed to meet the minimum standard of competence required of an attorney and constitutes professional malpractice.

148.     By reason of said professional malpractice, the plaintiffs have suffered actual damages in the amount of $150,000 and $70,000 for excess interest on the inflated loan, and punitive damages as provided in ¶ 116 above.

## EIGHTH CAUSE OF ACTION: DECLARATORY RELIEF AGAINST HUD

149.     Plaintiffs repeat and reallege the allegations set forth above as if fully set forth in this paragraph.

150.     HUD, through the FHA, insures mortgages under the National Housing Act not just for the benefit of the insured lender, but primarily for the benefit of the borrower who not only pays the premium, but would not otherwise qualify for a mortgage but for the federal insurance against the borrower's possible default.

151.     It is foreseeable that borrowers can and have been damaged when HUD negligently and carelessly discharges its duty to evaluate applications for mortgage insurance under *both* 12 U.S.C. § 1709 *and* the Fair Housing Act, including but not limited to its failure to discharge its duty to affirmatively prevent and prohibit discrimination of the sort alleged in this Verified Complaint.

152.     The allegations contained herein describe HUD as possessing extensive actual knowledge of the geographical areas, typical features, preferred targets, and other demographic factors which signal a high risk of a fraudulent predatory sale/loan scheme.  HUD also possesses extensive actual knowledge of the various tactics employed by many of the third party defendants herein to successfully deceive and defraud minority first time purchasers/borrowers, including actual knowledge of prior conduct by defendants BHD and Fessler, MHE and Malone.

153.    In order to discharge its mandate under the Fair Housing Act to prevent and preclude racial discrimination in housing related transactions, HUD has a duty to take such steps as are reasonable and exercise such due diligence as is necessary to effectively combat and prohibit the racially discriminatory scheme described herein.

154.    Plaintiffs, having been aggrieved by the failure of HUD to discharge said duty and mandate, is entitled to a declaratory judgment setting forth HUD's legal obligation to exercise reasonable care and due diligence in the issuance of FHA mortgage insurance.

## NINTH CAUSE OF ACTION: DECLARATORY RELIEF
## AGAINST CHASE MORTGAGE COMPANY

155.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth in this paragraph.

156.    Upon information and belief, the alleged assignment of the alleged mortgage loan on 102 Etna Street was made in furtherance of defendants' scheme to defraud plaintiffs.

157.    Plaintiffs are entitled to a declaratory judgment of this Court determining that the alleged assignment to Chase Mortgage Company West was not in due course and that any rights that Chase obtained as a result of said alleged assignment are subject to plaintiffs claims in this action.

158.    Plaintiffs are also entitled to a preliminary injunction against Chase enjoining Chase from taking any action to foreclose the alleged mortgage on 102 Etna Street and, upon trial of this action, a permanent injunction, against Chase enjoining Chase from taking any action to foreclose the alleged mortgage on 102 Etna Street.

159.    Plaintiffs have no adequate remedy at law.  Plaintiffs have not sought this or similar relief in any other action or proceeding.

## TENTH CAUSE OF ACTION: DECLARATORY JUDGMENT
## THAT ATTORNEYS' FEES CLAUSE IS RECIPROCAL

160.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth in this paragraph.

161.    By reason of the facts alleged above at ¶¶ 107-111 of this Complaint, the Councils are entitled to a declaration that ¶18 of the mortgage agreement entered into by them on January 18, 1999, providing for recovery of costs, disbursements and reasonable attorneys fees for the lender, implicitly provides and covenants that the borrower as well may recover the costs, disbursements and reasonable attorneys fees should said borrower substantial prevail in litigation arising out of said mortgage agreement.

## JURY DEMAND

162.    Trial by jury is requested.

**WHEREFORE:**

A)      upon plaintiffs' first cause of action, plaintiffs demand rescission of the note, mortgage, contract of sale, and all riders thereto for the subject premises entered into between defendant/third party plaintiff and any private third party defendant, $150,000.00, plus $70,000 for excess interest on the inflated loan, and the value of any damage to the plaintiffs credit as and for actual damages, an amount to be determined by the trier of fact as and for compensatory damages, $5,000,000 against all defendants jointly and individually, as and for punitive damages; and

B)      upon plaintiffs second cause of action, plaintiff demands rescission of any and all contracts and agreements regarding the purchase of the subject premises and the financing thereof, judgment, jointly and individually, against all defendant co-conspirators in the amount $150,000.00, plus $70,000 for excess interest on the inflated loan, and the value of any damages

to plaintiffs credit as for actual damages, an amount to be determined by the trier of fact as and for compensatory damages, $5,000,000 as and for punitive damages; and

C)       upon plaintiffs third cause of action, plaintiffs demands judgment, jointly and individually, against all defendant co-conspirators in the amount $150,000.00, plus $70,000 for excess interest on the inflated loan, and the value of any damages to plaintiffs credit as for actual damages, an amount to be determined by the trier of fact as and for compensatory damages, $5,000,000 as and for punitive damages; and

D)       upon plaintiffs fourth cause of action, rescission of the loan documents plus the cost of this action; and

E)       upon plaintiffs fifth cause of action, rescission of the loan documents plus the cost of this action; and

F)       upon plaintiffs sixth cause of action, rescission of the loan documents, $150,000.00, plus $70,000 for excess interest on the inflated loan, and the value of any damages to plaintiff's credit as and for actual damages against all non-governmental defendants jointly and individually, plus the cost of this action; and

G)       upon plaintiffs seventh cause of action, $150,000.00, plus $70,000 for excess interest on the inflated loan, and the value of any damages to plaintiffs credit as and for actual damages, an amount to be determined by the trier of fact as for compensatory damages, and $5,000,000 as and for punitive damages against defendant Stephen Weinstock; and

H)       upon plaintiffs eighth cause of action of declaratory relief that HUD have a duty to warn prospective purchasers/borrowers of the appreciable risks and known hallmarks of predatory loans; and

I)       upon plaintiffs ninth cause of action, a judgment declaring that defendant Chase, as assignee of and successor to MHE, is not a holder in due course of the mortgage on 102 Etna

Street, Brooklyn, New York and is subject to all claims herein against MHE and further enjoining Chase preliminarily and permanently from enforcing the said alleged mortgage;

J) upon plaintiffs tenth cause of action, plaintiff are entitled to a declaration that the mortgage agreement entered into by them, provides and covenants that the borrowers recover the costs, disbursements and reasonable attorneys' fees should borrowers prevail in litigation; and

K) for the costs and attorneys fees incurred by plaintiffs in connection with this action; and

L) for such other and further relief as to this Court may seem just, equitable and proper.


Dated: New York, New York
       December 22, 2004


BROOKLYN CENTER FOR LAW & JUSTICE          JACOB, MEDINGER & FINNEGAN, LLP


By: _____                By: _____
Richard J. Wagner, Esq.(RW 3017)           Peter A. Cross, Esq. (PC 8492)
c/o Jacob, Medinger & Finnegan, LLP        Hugh A. Zuber, Esq. (HZ 4935)
1270 Avenue of the Americas                1270 Avenue of the Americas
New York, New York 10020                   New York, New York 10020
(212) 332-7700                             (212) 332-7700
Attorneys for Plaintiffs for Substantive   Attorneys for Plaintiffs for Substantive
and Attorneys' Fees Claims                 and Attorneys' Fees Claims